Harper, J.,
delivered the opinion of the Court.
After as mature an examination as we have been able to make* we have reluctantly come to the conclusion, that the decree of the Chancellor must be reversed, on both the points which are the subject of appeal.
The first question relates to the liability to debts, of the land which was devised to Mr. Henry Izard, in fee-simple conditional, by the will of his father. By the st. 5 Geo. 2, c. 7, P. L. 250, “ houses, lands, negroes, and other hereditaments, and real estates,” are made liable to, and chargeable with debts; and it is declared, that they shall be assets, in the hands of the heir, in the same manner that lands descended in England, are liable for the satisfaction of bond or specialty debts. From the generality of the terms of the statute, it is sufficiently plain, that whatever estate, or interest, Mr. Izard had in the land, was, during his life time, liable to be sold under execution for the satisfaction of his debts ; ■ and we are to inquire what that estáte, or interest, was. It was not a life estate, as seems to have been supposed, but a fee-simple conditional. The authorities are sufficiently clear, that by a gift in fee-simple conditional, as the law in relation to it was settled before the statute de donis, the heirs of the body took nothing as against the ancestor. qq,ey were named, not for any benefit intended to them, or to con. trol the ancestor’s power of disposition over the lands, but to define the nature, and extent, of his estate, and to point out the course of the descent, if no disposition should be made.
The authority of Bracton seems express to the point. In lib. 2, cap. 6, after speaking of' the “ donatio simplex et pura,” which is a gift to aman, and his heirs generally, and saying that nothing is given to the heirs, though they are named in the gift, he observes, that the donor may enlarge the grant, and make others quasi heirs, by granting to one, his heirs, and assigns. He then adds: Item, sicut ampliari possunt Jtceredes, sic ut prosdictum est, ita coarctari poterunt per modum donationis, quod omnes hmredes ad succession-em non vocantur. Modus enim legem dat donationi, et modus tenendus est contra jus commune, et contra legem, quia modus et conventio vincunt legem: ut si dicatur, do tali tantam terram, cum pertinentiis, in N., habendam et tenendam sibi et haredibus suis, quos de carne sua et uxore sibi desponsata procreatis hdbuerit, <Spc. He adds in the same chapter, “ Et unde hujusmodi hmredes procreati fuerint, ipsi tantum ad successionem vocantur ; et si taliter feqfatus aliquem inde ulterius feofaverit, tenet feofamentum, et hmredes tenentur ad warrantiam: cum ipsi nihil clamare possunt *235 nisi ex successione et descensupaventum; quamvis quibusdam videatur quod ipsi feofati fuerint cum parentibus, quod non est verum.” That is, “ if heirs of this sort are begotten, they only are called to the succession; and if one thus enfeoffed, enfeoff over another, the feoffee holds the land, and the heirs are bound to warranty, inasmuch as they can claim nothing but by succession and descent from the parent; although it appears to some that they were enfeoffed together with the parent, which is not true.”
Blake *• Heyward, ante,p.208.
The same inference may be drawn from what is said by Lord Coke, 1 Inst. 19, a. “If donee in tail at the common law, had aliened, before any issue had, and after had issue, this alienation had barred the issue, because he claimed fee simple.” When, therefore, it is said, that it was on the performing of the condition, by the birth of issue, that the donee was enabled to alien, to forfeit, or to charge, it must mean, that he was enabled as against the donor. As against the issue, his power was perfect before performance, and they could claim nothing as against his act.
The same thing is said in the case of Willion v. Berkley, Plowd. 241; and so also in Bac. Abr. Estate in Tail, in the preliminary remarks to that title, which Mr. Preston, in his Treatise on Estates, attributes to Chief Baron Gilbert. 2 Prest. Est. 294, ch. 7. Mr. Preston, himself, in the treatise mentioned, examines the subject, and comes to the same conclusion, that the issue had no right, as against the ancestor. Ib. It was only by the effect of the statute de donis, that the issue were enabled to avoid the alienation of the ancestors^ Thus it is said by Lord Coke, 2 Inst. 336, that the formedon in descender lay not at the .common law. That remedy was given by the statute; although in a particular instance, it would seem, that the formedon in descender did lie at the common law. Hargrave’s note 5, to 1 Inst, 19 a.
The lands being thus liable in the hands of Mr. Izard, it was bound by the lien of the decree against him, as we have determined during the present sitting; and lands bound by a judgment, or a decree, according to our decisions, are bound also in the hands of the heir. But if there had been no decree against Mr. Izard, in his life time, yet if the heir takes only by succession from the ancestor, and in his right, it would seem to follow, that whatever would be liable to debts in his hands, must be assets in the hands of the heir; and such is the purport of the statute, 5 Geo, 2. c. 7. (supra.)
With respect to the other point involved in the case, we have lately had occasion, in several instances, to consider how far a vo *236 Iuntary settlement can be supported against creditors, whose debts existed at the time. It will not be necessary, therefore, to go into any elaborate examination of cases ; but I will endeavor to express, with as much precision as the nature of the subject will allow, our views of the law.
The rule laid down by Chancellor Kent, in Reade v. Livingston, 3 Johns. C. R. 481, which, however, is not fully sanctioned in this State, is, that any, the least indebtedness, at the time of a voluntary settlement, will vitiate it. And the highest English authorities go far to support him in this position. In Russell v. Hammond, 1 Atk. 15, in Fitzer v. Fitzer, 2 Atk. 511, and in Taylor v. Jones, 2 Atk. 600, Lord Hardwicke repeatedly says, in general terms, that with respect to creditors, a voluntary settlement is always fraudulent. An exception was made in the case of Lush v. Wilkinson, 5 Ves. 384, where there was a single inconsiderable debt. That was a case of peculiar circumstances, and the Master of the Rolls observed, that every man must be indebted for the weekly bills of his house. The general rule then, I take to be, that a voIuntary settlement is void as to existing creditors : but it admits a qualification, if the debts are utterly inconsiderable, when compared with the amount of the donor’s property, like those which a man incurs for the weekly expences of his household ; so that in fact, he cannot be considered to be substantially indebted.
The expression used in Lush v. Wilkinson, that it must depend upon this, whether the party is in. solvent circumstances, has occasioned some embarrassment. The word insolvent is not very definite in its meaning. It can hardly mean, that the party after making the voluntary conveyance, has retained property to an equal, or greater, estimated amount than his debts. Perhaps it may be said, that a man indebted to near the estimated value of his property, is generally insolvent. It seems to me, from comparing the cases, that the solvency must be judged of by the event. If a man indebted at the time of the settlement, continues embarrassed, and becoming more and more involved, ends in total and acknowledged insolvency, this is evidence enough of his insolvency as to the existing creditors, whose debts remain unpaid. The exception is, where the debts are so trifling and inconsiderable, that they cannot be regarded as having materially contributed to his subsequent failure. Whether there may not be a further exception, when the failure has been produced by some sudden and unforeseen casualty, such as fire, or tempests, it is not necessary now to inquire. The fluctuations in the value of property, occasioned by the mercantile *237 condition of the country, cannot however be ranked among those casualties. These fluctuations are constantly tailing placo, and men must calculate upon, and be prepared for them. If a man were ever so much indebted at the time of the settlement, and should afterwards pay off his debts, and become totally unembarrassed, these debts could not affect the settlement though be should subsequently become insolvent. He has proved his solvency at the time of the settlement. Or if he should so pay them off, with the exception of a trifling balance, so inconsiderable as to make it evident that the omission to pay that off also was a mere casualty, this might not vitiate. This was the case of Howard v. Williams, (supra,) where of very large debts, a very trifling balance, less I believe, than fifty dollars, remained unpaid, when the settlement was impeached; and it was held that this was 0 mere accident.
2 Bailey, 123.
vide Riley’s Equity Cases, p.232.
13 Eiiz. e. 5’ p‘Ll fi7,
cowp.434.
These are'the views we expressed in the late case of M’Elwee v. Sutton, decided by us at Columbia, at our last sitting, and they seem to us consistent with the other decided cases in this State ; particularly with the case of Howard v. Williams, which is principally relied on by the Chancellor, and with Iley v. Niswanger, 1 M’C. Ch. 521, as also with Simpson and Davidson v. Graves, decided by this Court, at Charleston, in April, 1828, but not yet reported. The authorities, both in this State, and in England, are too uniform to allow us to decide differently, even if we ourselves were disposed to put a different construction upon the statute of Elizabeth. But in truth I do not know any other rule that could be adopted. It would not do to say, that a man may make a set. tlement, if he retains property apparently sufficient to pay his debts. A man must know that his creditor’s security is lessened, if he conveys away a considerable portion of his property, although he retains what appears to be more than sufficient. To say that the property must be very abundantly sufficient, would be to have no rule at all; but to determine every case, perhaps according to its circumstances, or perhaps according to the bias, or feelings, of the judge, or the jury, who should pass upon it.
It is said, upon the authority of Lord Mansfield, that the question in every case is bona fides, or not; although Lord Mansfield never doubted the authority of the cases to which I have referred. This is in some sense true, but Courts must lay down for themselves some tests, by which to judge of the bona jides. We have no means of looking into the heart of a man, or deciding upon his motives but by his actions. It will not do to say, that because we are satisfied in our private judgments, that no actual fraud was in. *238 tended; because Mr. Izard was known to be a gentleman of the most scrupulous integrity, and honor; that we shall apply another rule, than we should do in the case of an individual, whose charac* *er was ^ess known and established. Although it may be called drawing a conclusion of fact, yet the making a certain inference from certain appearances, becomes at length a subsidiary rule of law. There are, as it has been said, certain general presumptions to take the place of individual and specific belief: as in the case of a bond, of which there has been no acknowledgment, and on which nothing has been paid for twenty years; we must pronounce it paid, although we may have the most intimate private conviction that it never has been paid.
We think there can be no doubt, but that Mr.- Izard must be considered to have been indebted for the amount of his purchases of his father’s estate, at the time of the settlement, although it may be, that the other parties interested in that estate, could have avoided those purchases. Whatever calculation may be made, and the difference of calculation is wholly immaterial, this was a very considerable debt. Although he may have retained property to two or three times the amount, this debt alone has- occasioned the present insolvency of his estate; for the estate owes no other. And this has been occasioned by no sudden or unforseen casualty, but by the ordinary, and gradual fluctuations, in the value of property. According to the principles I have expressed, the settlement cannot then be supported.
Another ground was taken in the argument, on which perhaps it is not necessary to remark at great length. It was, that the complainants in the present case were aware of the settlement, and acquiesced in it, by neglecting to enforce their demand; and that they demanded, and received, from Mr. Izard, a security for their debt, which was satisfactory to them: and therefore, ¡.that they ought not now to be permitted to enforce their claims on the settled property. I know of no rule, but the statute of limitations, or the presumption arising from length of time, barring their demands, that compels creditors to enforce their demands on a party, who has made a settlement, or to lose their recourse on the settled property. Perhaps it may be, in general, a benefit to the voluntary donees, that indulgence should be given. Men do not indulge their debtors that they may become insolvent, but that they may pay; and, if it should turn out, contrary to expectation, that they become less able to pay, it would be unreasonable, that this well meant indulgence, should be to the injury of the creditor. It could not *239 have been intended, and was not calculated to injure the donee. The case of Estwick v. Caillaud, 5 T. R. 420, was relied on as a case in which the Court refused to relieve a creditor after long acquiescence. But the determination was not at all upon that footing. That was not a voluntary conveyance, being in part for the payment of creditors; and therefore was not subject to the rules respecting voluntary conveyances: and the jury determined that there was no actual fraud. It is true, that the Court seems to go upon the supposition, that the portion of the property which Lord Abingdon conveyed to his own use, might be made liable in equity to creditors, who were not provided for ; and that it was afterwards determined, upon a bill filed in the Exchequer, that no such relief could be had; Caillaud v. Estwick, 2 Anstruther, 381. But that goes on the principle, as expressed by Chief Baron Macdonald, in the case, that equity does not aid an execution at law. He observes, that there are different securities which an execution cannot reach : first, from the nature of the property, as stock in the funds ; secondly, from the hands in which it is, as a trustee. The question of actual fraud, it is said/ was settled at law. It may be observed, that although equity, will not aid in such a case, the property is not out of the reach of creditors, as it may be reached in general by a ca. sa.
Then as to the security that was to be taken. I do not know on what principle, a creditor, who becomes alarmed at his debtor’s making a settlement, and demands and receives security, can be precluded recourse to the settled property, if the security should prove insufficient; even though he should profess himself satisfied with the security. He was mistaken as to the sufficiency of the security, but has done no injury to the donees. It would be a different case, if the party, when about to make a settlement, should consult his creditors, and they should consent to the settlement, on condition of a specified security’s being given. In such a case, the consent would be the inducement to the giving of the security. Here there is no direct proof of the consent, nor does it in any manner appear, that Mr. Izard was induced by such assent to give the security. In th'e case of Stephens v. Olive, 2 Bro. C. C. 90, which was relied on, the property settled, was made liable, by the settlement itself, to the only existing creditor. If a party about to make a settlement, sufficiently secures his existing debts, by mortgage, Gr otherwise, the settlement of course will be good. No injury is done to the creditors. For aught that appears, this was done in Stephens v. Olive; and the existing mortgage creditor was not complaining, or before the Court.
*240 Upon the whole matter, we cannot see sufficient grounds to support the settlement, in the case before us: and it is, therefore ordered, and decreed, that the Chancellor’s decree be reversed; and that the reaI and personal estate referred to, be sold in satisfaction of the complainants’ demands, as prayed in their bill.

Decree reversed.